**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NIPPO CORPORATION/INTERNATIONAL | : | |
| BRIDGE CORPORATION, | : | |
| | : | |
| Plaintiff/Counterdefendant, | : | |
| | : | **CIVIL ACTION** |
| v. | : | **NO.  09-cv-0956** |
| | : | |
| AMEC EARTH & ENVIRONMENTAL, INC. | : | |
| | : | |
| | : | |
| Defendant/Counterclaimant. | : | |

_____

**MEMORANDUM OPINION AND ORDER**

**RUFE, J.**                                                                              **September 21, 2011**

This matter involves claims and counterclaims arising from a construction subcontract

between Plaintiff Nippo Corporation/International Bridge Corporation ("the Joint Venture") and

Defendant and Counterclaimant AMEC Earth and Environmental, Inc. ("AMEC").  Before the

Court are three motions for partial summary judgment: (1) a motion by AMEC for summary

judgment as to all but one count, based on the Joint Venture's failure to comply with mandatory

notice provisions of the Subcontract, or, in the alternative, for summary judgment as to Counts

2, 3, 4, 5 and 7 on other grounds [doc. no. 80]; (2) a motion by the Joint Venture for summary

judgment as to AMEC's withholding of liquidated damages [doc. no. 70]; and (3) a motion by

the Joint Venture for summary judgment regarding undisputed Change Orders [doc. no. 79].  For

the reasons set forth below, AMEC's motion will be granted in part, the Joint Venture's motion

regarding liquidated damages will be denied, and its motion regarding undisputed change orders

will be granted in part.

# I.    FACTUAL AND PROCEDURAL BACKGROUND

In November 2003, AMEC entered into a prime contract with the United States

government through the Air Force Center for Engineering and the Environment (the "Air Force")

for various construction projections, including work at the Andersen Air Force Base in Guam.[1]

On September 27, 2004, the Air Force issued Task Order 0013, which included demolition,

removal and replacement of the north runway at Andersen (the "Project").[2]   In April 2005,

following a competitive bidding process, AMEC awarded the Joint Venture a Subcontract to

carry out the Project for a fixed fee exceeding $21 million (the "Subcontract").[3]   The Project

involved removal of the existing hot mix asphalt ("HMA") runways and their replacement with

portland cement concrete ("PCC") pavement, with installation of asphalt at taxiway tie-ins,

runway shoulders and overrun, and removal and reinstallation of runway lighting fixtures.[4]

It is an understatement to say that things did not go well thereafter.   Due to a series of

problems with the materials required for the Project, the Subcontract's specifications, and

installation and completion of the paving, the Project's initial scheduled completion date of April

26, 2006 was extended to June 29, 2006; ultimately, the Project was completed ten months later

on May 31, 2007.[5]   Each party blames the other.

The Joint Venture's Complaint includes seven counts for breach of contract and one

---

[1] Defendant and Counterclaimant AMEC's Statement of Material Facts Not in Dispute ("AMEC SOMF") ¶ 1; Pl.'s Statement of Material Facts ("JV SOMF") ¶ 1.

[2] AMEC SOMF ¶¶ 4–5; JV SOMF ¶ 2.

[3] AMEC SOMF ¶ 16; JV SOMF ¶ 3.

[4] AMEC SOMF ¶ 5; Compl. ¶ 21.

[5] AMEC SOMF ¶ 17; Compl. ¶¶ 7, 52–53.

count for consequential damages.  Count 1 arises from the alleged shortage of compliant

aggregate base materials capable of meeting the Subcontract's rapid draining requirements,

AMEC's subsequent modification of the base material specifications to permit the use of existing

but poorly draining base materials instead of imported materials, and the alleged repercussions of

that change on the remainder of the Project, including increased costs and significant delays in

Project completion.[6]  Count 2 arises from the Joint Venture's allegations that AMEC's hot mixed

asphalt voids-in-mineral-aggregate ("VMA")[7] specification were impossible to meet using only

locally available aggregate in the mix, and were unnecessary in Guam's tropical environment,

and that AMEC's initial insistence on compliance with that specification ultimately delayed the

HMA paving process and required the Joint Venture to remove and replace, in part or whole, 25

lots of HMA pavement.[8]  Counts 3 and 4 arise from disputes over whether removal and

replacement of some 5,000 cubic yards of the PCC pavement placed on Runway 5 by the Joint

Venture was necessary, as well as costs and delays related to completion of the paving.[9]  Count 5

arises from additional costs and productivity losses allegedly suffered by the Joint Venture due to

---

[6] Compl. ¶¶ 11–20, 58–64; JV SOMF ¶¶ 18–21.

[7] A voids-in-mineral-aggregate ("VMA") standard sets the minimum level of voids permitted in an asphalt mix between the aggregate.  The VMA "describes that portion of the space in a compacted HMA pavement or specimen which is not occupied by the aggregate"—that is, the area occupied by air and asphalt not absorbed by the mineral aggregate. See Prithvi S. Kandhal, Evaluation of Voids in the Mineral Aggregate for HMA Paving Mixtures, Nat'l Ctr. for Asphalt Tech., Auburn Univ., NCAT Report No. 96-4, at 1 (1996).  The purpose of the VMA specification for the Project was to ensure that there was sufficient asphalt between the aggregate in the mix to hold the aggregate together, so that it would not break off and pose a hazard to aircraft using the runway.  AMEC SOMF ¶¶ 57–59; Decl. of Kevin A. Rosenfield in Opp'n to AMEC's Mot. for Partial Summ. J. ("Rosenfield Decl."), Ex. 60 at 7–8 (Expert Report on Hot Mix Asphalt Pavement, by Richard E. Root ("Root Report")).  The Parties dispute whether the relatively high VMA percentage (13%) was necessary. See Root Decl. at 8.

[8] Compl. ¶¶ 21–32, 65–70; JV SOMF ¶¶ 13–17, 84–106.

[9] Compl. ¶¶ 33–43, 71–82; JV SOMF ¶¶ 34–83.

AMEC's allegedly defective design of the runway's electrical and lighting system and unanticipated design changes during the course of the Project.[10]  Count 6 arises from unresolved change order requests submitted by the Joint Venture when AMEC directed it to perform extra or different work and AMEC's alleged breach of its duty to evaluate and negotiate the change order requests and to equitably adjust the Subcontract price.[11]  Count 7 generally seeks equitable adjustment of the fixed price Subcontract to account for compensable or excusable performance delays and to adjust the term of the Subcontract for delays for which AMEC is allegedly improperly assessing $837,500 in liquidated damages.[12]  Finally, Count 8 seeks consequential damages.[13]  The Joint Venture asserts damages in an amount nearly equal to the initial Subcontract price.[14]

AMEC has filed counterclaims seeking a declaratory judgment, under 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, that AMEC is entitled to deduct $837,500 in liquidated damages from the amount it owes the Joint Venture.[15]  AMEC also seeks attorneys' fees and expenses associated with defending against the Joint Venture's allegedly false and

---

[10] Compl. ¶¶ 44–48, 83–88.

[11] Compl. ¶¶ 49–51; 89–94.

[12] Compl. ¶¶ 95–98; Am. Counterclaim ¶ 9.

[13] Compl. ¶¶ 99–100.

[14] JV SOMF ¶ 7 (alleging damages of more than $17 million); Compl. at 15–16 (seeking damages of $18.6 million or more).

[15] Am. Counterclaim ¶¶ 9–18.  This Court previously dismissed AMEC's counterclaim for liquidated damages, with leave to amend. See Order Granting in Part and Denying in Part Plaintiff's Motion to Dismiss Counterclaims [doc. no. 40].  AMEC subsequently amended its counterclaim, seeking declaratory judgment regarding liquidated damages.

overstated claims, including demands for payment by the Air Force.[16]

After fact discovery in this matter closed, the Parties filed their motions for summary judgment. The Joint Venture has filed two motions for partial summary judgment. First, the Joint Venture moves for summary judgment as to AMEC's withholding of liquidated damages, on grounds that the liquidated damages clause is an unenforceable penalty.[17] Second, the Joint Venture moves for summary judgment as to nine undisputed change orders approved, but never processed, by AMEC.[18]

AMEC's motion for partial summary judgment seeks dismissal of all claims except for Count 6 (unresolved change orders) on grounds that the Joint Venture failed to comply with the mandatory notice provisions of the Subcontract.[19] Alternatively, AMEC moves to dismiss:

- Count 2, relating to the HMA specifications, and that portion of Count 7 based on delays resulting from the dispute over the HMA specifications, on grounds that the Joint Venture could have met the Subcontract's HMA specifications but failed to submit a compliant HMA design;

- Count 3, relating to removal and replacement of non-compliant PCC pavement, and that portion of Count 7 based on delays relating to removal and replacement of the Lane 5 PCC pavement, on grounds that the Joint Venture is solely responsible for the non-compliant Lane 5 work, and that AMEC's insistence on removal and replacement does not constitute economic waste; and

- Count 2 (relating to HMA), Count 4 (relating to completion of the PCC pavement), and Count 5 (relating to electrical work) on grounds that the Joint Venture is attempting to prove its damages for these counts using a total cost

---

[16] Am. Counterclaim ¶¶ 19–26.

[17] Pl.'s Mot. for Partial Summ. J. re: Liquidated Damages [doc. no. 70].

[18] Pl.'s Mot. for Partial Summ. J. re: Undisputed Change Orders [doc. no. 79].

[19] Def./Counterclaimant's Mot. for Partial Summ. J. ("AMEC Mot.") [doc. no. 80] at 2–3.

methodology.[20]

The Joint Venture submitted a declaration of its expert Richard Root as an exhibit to its response in opposition to AMEC's Motion.  AMEC moved to strike the declaration as an untimely expert report.[21]  Earlier this year, the Court granted the motion, striking portions of the declaration that constituted a new expert report, and all references to that portion of the declaration in the Joint Venture's accompanying briefing and statements of material fact.[22]  The Court, however, permitted the Joint Venture to serve a Supplemental Expert Report, reopened expert discovery limited to the issues related to the supplemental expert opinion, and set a schedule for related supplemental briefing.  The Court placed the motions for summary judgment in suspense pending completion of the supplemental expert discovery period and supplemental briefing.  That period has now closed, and the motions are ripe for disposition.

Because of the number and complexity of the facts in this case, the Court addresses the relevant facts and factual disputes, beyond those described *supra*, only as required for resolution of each of the pending motions.

## II.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), a court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[23]  A fact is "material" if it could affect the outcome of

---

[20] AMEC Mot. at 4–5.

[21] Doc. no. 90.

[22] Doc. no. 104.

[23] Fed. R. Civ. P. 56(a).

the suit, given the applicable substantive law.[24]  A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party."[25]

A party moving for summary judgment has the initial burden of supporting its motion by referring to admissible evidence[26] showing the absence of a genuine dispute of a material fact or by showing that there is insufficient admissible evidence to support the fact.[27]  Once this burden has been met, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."[28]

In considering a summary judgment motion, the Court does not weigh the evidence or make credibility determinations; "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [its] favor."[29]

## III.  DISCUSSION

### A.    AMEC's Motion for Partial Summary Judgment

#### 1.    *Summary Judgment Regarding Compliance with Mandatory Notice Provisions.*

AMEC moves for summary judgment as to all Counts against it, except Count 6 (unresolved change orders), because, it argues, the Joint Venture's claims are barred by its failure

---

[24] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[25] Id.

[26] See Callahan v. A.E.V., Inc., 182 F.3d 237, 252 n.11 (3d Cir. 1999).

[27] See Fed. R. Civ. P. 56(c).

[28] Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006).

[29] Anderson, 477 U.S. at 255.

to provide contractually-mandated notice of its claims.[30]  Section 00700 of the Subcontract provides that the Joint Venture is to provide AMEC with notice under various circumstances. First, when the Joint Venture encountered "conditions at the site that materially differ from those shown on the Plans or indicated in the Specifications, [it was to] immediately (within 7 days) give notice thereof to AMEC, and before such conditions are disturbed," and that if such notification is not provided, the Joint Venture would be responsible for costs related to the differing site conditions.[31]  Additionally, the Subcontract provides that:

> The Contract Price may only be changed by a written Change Order executed by AMEC.  Any request for an increase in the Contract Price shall be based on written notice delivered to AMEC prior to performance of the proposed work giving rise to the claim, and within 7 days of discovery of conditions that give rise to such a claim, except in the case of emergency. . . . The written notice . . . shall include the amount of the claim with supporting data.[32]

The Subcontract also incorporates by reference Federal Acquisition Regulations ("FAR"), including FAR 52.243-4 as a supplemental condition.[33]  FAR 52.243-4 provides that the contractor has a right to additional compensation for costs incurred within 30 days of giving notice and provides that the contractor submit a request for an equitable adjustment within 30 days of providing notice.[34]

---

[30] AMEC Mot. 2–3.

[31] Decl. of Michael M. Suga in Support of Def. & Counterclaimant AMEC Earth and Environmental Inc.'s Mot. for Summ. J. ("Suga Decl."), Ex. 16 (Subcontract's General Conditions Specifications, § 00700, ¶ 1.21); JV SOMF ¶ 8.

[32] Suga Decl., Ex. 16 (Section § 00700-1.22.2); JV SOMF ¶ 9.

[33] Rosenfield Decl., Ex. 2.

[34] JV's Resp. in Opp'n at 6 n.5 (citing 48 C.F.R. § 52.243–4); Suga Decl., Ex. 17.

The Subcontract is governed by Nevada law,[35] which provides that notice must be sufficient under the circumstances to make the contracting entity aware of the difficulties and permit it to remedy the situation to avoid excess costs, so long as a sufficiently detailed claim follows, when the value of the claim cannot be determined with reasonable accuracy at the outset.[36]  The Nevada Supreme Court, in Eagle's Nest Ltd. Partnership v. Brunzell, concluded that requiring strict compliance with a provision mandating submission of a claim within a reasonable period of time after the delay would require the contractor to "prognosticate . . . all delay costs before they had been incurred."[37]

The Joint Venture contends that to the extent Nevada law is unclear, Nevada courts would look to federal common law.[38]  The Court agrees, particularly given that the Subcontract incorporates FAR clauses pertaining to notice,[39] and because Eagle's Nest itself relied on a

---

[35] The Subcontract provides that Nevada law governs matters arising from the Subcontract.  AMEC Mot. at 3 n.1 (citing Specification Section 00500, Art. 5).

[36] Eagle's Nest Ltd. P'ship v. Brunzell, 669 P.2d 714, 716 (Nev. 1983).

AMEC contends that Eagle's Nest is inapposite because the contract in that case did not state a specific time period for notice, nor did it require that the notice include the amount of the claim.  AMEC Reply at 5–6.  The Court disagrees.  Eagle's Nest did not predicate its holding on a finding that notice was made within a reasonable amount of time, but instead determined the notice was sufficiently compliant because the owner had actual notice, the written notice made sufficiently clear that delays and costs would be incurred, and it provided the owner with time to remediate.  In addition, though the contract did not require that the initial notice include the amount of the claim, it did require that a claim for a specific amount be submitted within a reasonable time thereafter.  That is sufficiently analogous to the notice provision here.  Both provisions require calculation of damages before they can be accurately determined.

[37] Eagle's Nest, 669 P.2d at 716.

[38] JV Resp. in Opp'n at 6.

[39] Accord Linan-Faye Constr. Co. v. Hous. Auth. of Camden, 49 F.3d 915, 922 (3d Cir. 1995) (agreeing that where there is a dearth of state case law interpreting contract provision that was incorporated pursuant to federal regulation, state court would interpret clause "against the backdrop of federal case law addressing [it]." ).

-9-

decision applying federal common law to determine compliance with contractual provisions.[40]

Under federal common law, notice provisions are liberally construed, with compliance

determined by whether the notice given satisfies the purposes of the clause.[41]  Where the

contracting entity has actual or constructive notice of the conditions underlying the claim and an

opportunity to investigate, such notice may be sufficient regardless of whether the contractor

strictly adhered to the specific requirements of the notice clause.[42]  Where the contracting officer

directs work knowing the likely outcome, strict compliance with notice provisions is

unnecessary.[43]  The "overriding legal principle" is that "[w]ritten notice . . . must be supplied by

the contractor before such time that the [contracting entity] would suffer if not apprised of the

facts."[44]  Courts will permit otherwise late claims under a notice clause where late notice has not

prejudiced the contracting entity.[45]  Thus, notice principles under federal common law are

consistent with the approach adopted by Nevada in Eagle's Nest.

AMEC asserts that the Joint Venture did not provide AMEC with written notice as to the

amount of the claim prior to the completion of work on the Project on May 31, 2007—the last

---

[40] Eagle's Nest, 669 P.2d at 717 (citing Farnsworth & Chambers Co. v. United States, 346 F.2d 577 (Cl. Ct. 1965), which held that compliance with notice of changed conditions clause in contract requires only that the government know that the contractor is claiming a condition).

[41] See, e.g., Brinderson Corp. v. Hampton Rds. Sanitation Dist., 825 F.2d 41, 44 (4th Cir. 1987) (compliance with notice-of-changed-conditions clauses is determined by whether the owner has actual and constructive notice of the conditions underlying the claim and an opportunity to investigate).

[42] Id.; see also Perini Corp. v. City of New York, 18 F. Supp. 2d 287, 293 (S.D.N.Y. 1998), aff'd, 182 F.3d 901 (2d Cir. 1999) ("Federal law, as developed by the Board of Contract Appeals and the Court of Claims, construes the notice provisions of the Changes Clause liberally; thus a contractee's actual or constructive notice of the conditions underlying the claim excuses formal compliance when federal law is applied.").

[43] Calfon Constr., Inc. v. United States, 18 Cl. Ct. 426, 438 (1989), aff'd, F.2d 872 (Fed. Cir. 1990).

[44] Id.

[45] 1 Bruner & O'Connor Construction Law § 4:35.

day of the Project.[46]  On that day, in response to a demand by AMEC for submission by May 15,

2007 of all paperwork required to resolve outstanding contract issues,[47] the Joint Venture noted

by letter that AMEC had not responded to numerous change order requests, and that the Joint

Venture had repeatedly provided AMEC with notice of its actions and inactions that would cause

the Joint Venture to incur additional costs and time for which AMEC was responsible and for

which it would be preparing additional change orders, including change orders related to the

counts in this action.[48]

　　　　AMEC contends that this "notice" of outstanding change orders related to aggregate base

materials, the PCC and HMA pavement, and the electrical work was non-compliant with Section

00700–1.22.2 of the contract because it came too late—on the last day of the contract—and

because it failed to specify the amount of the requested contract price adjustment or provide

supporting data.

　　　　The Joint Venture ultimately submitted its request for equitable adjustment of more than

$19 million on March 21, 2008, which AMEC rejected in May 2008.[49]  AMEC argues that

because the unsubmitted change orders included direct costs and delay damages for the aggregate

base materials, hot mix asphalt, portland cement concrete paving, and electrical work—the same

claim items for Counts 1–5 and 7 in the Joint Venture's Complaint—those claims are barred for

---

[46] AMEC Mot. at 2–3.

[47] In the letter, the Joint Venture disputed that there was any basis under the contract for requiring all invoices and change orders to be submitted by May 15, 2007 in order to close out the Project by June 30, 2007. Suga Decl., Ex. 15 (May 31, 2007 letter) at 1–2.

[48] Suga Decl., Ex. 15 at 2–5.

[49] McQuiston Aff. ¶ 25; Suga Decl., Ex. 17; Decl. of John M. Robertson ("Robertson Decl.") ¶ 25.

non-compliance with the mandatory notice provisions.

The Joint Venture counters that it provided AMEC with timely written and detailed notice of each of the conditions giving rise to its claims, complying with the notice requirement and permitting AMEC to take remedial action.[50]  First, as to notice of the cost issues arising from a series of problems related to base course materials that resulted in delays beginning in April 2006 and which persisted through March 2007,[51] the Joint Venture identifies a range of communications prior to and after the onset of delays that notified AMEC of the delays and extra costs,[52] as well as notes from weekly production meetings between the Joint Venture and AMEC demonstrating AMEC's awareness of the problems relating to inadequate base course materials.[53] Second, the Joint Venture identifies a series of direct communications beginning in July 2006 that it asserts provided AMEC with timely notice of defective HMA specifications and of "the

---

[50] JV Resp. in Opp'n at 2–3.

[51] Robertson Decl. ¶ 8.

[52] Rosenfield Decl., Ex. 13 (Aug. 10, 2005 submittal to AMEC noting the fine aggregate in existing base course was not rapid draining); Rosenfield Decl., Ex. 11 (Aug. 20, 2005, e-mail from the Joint Venture to AMEC providing test results that purportedly demonstrate the existing base course material did not meet drainage specifications); Rosenfield Decl., Ex. 18 (May 19, 2006 e-mail from the Joint Venture to AMEC noting that the Joint Venture had "already incurred added cost using up material at site rather than placing imported material where we wanted to use it," AMEC had already caused the Joint Venture "to handle and haul material at site rather than import material," and the Joint Venture "may need to ask [for] additional compensation . . . ."); Rosenfield Decl., Ex. 19 (June 9, 2006 e-mail from the Joint Venture to AMEC noting that the excess of fine aggregate in the existing base course material may prevent proper drainage; that inadequate base material would later affect the quality of the portland cement concrete paving; and noting that the Joint Venture had lost "one day of critical path activity as a result of [AMEC's] order . . . to stop importing aggregate base course material," and that it would in "due course request an equitable adjustment in contract price"); Rosenfield Decl., Ex. 20 (Sept. 18, 2006 letter from the Joint Venture to AMEC noting repeated delays resulting from AMEC's restrictions on the use of imported base material and extra-contractual work resulting from AMEC's requirement that the Joint Venture use non-conforming existing material, and confirming that the Joint Venture would be filing a claim that would include "actual damages and delay damages as will be determined when the full extent of such damage can be determined").

[53] Rosenfield Decl., Exs. 16 at unnumbered p.3, 17.

substantial costs involved with the [resulting] delay,"[54] and communications that suggest AMEC understood there would be delays resulting from the change in the HMA mix design and suspension of HMA paving, and claims likely to be associated with them.[55]  Third, the Joint Venture identifies a number of communications it asserts provided timely notice regarding damages and delays related to the PCC paving and completion.[56]

---

[54] JV SOMF ¶ 14; Rosenfield Decl., Ex. 3 (July 22, 2006 letter from the Joint Venture to AMEC regarding the suspension of HMA paving until a new HMA mix was designed and approved, noting that the Joint Venture was "being damaged by this suspension of a critical activity," in part because it impacted the overall project schedule. The Joint Venture noted that "[w]hen the full impact on cost and schedule can be determined, we will provide greater detail on this subject.  We will then expect [AMEC] to issue a Change Order to the Contract as provided at paragraph 1.22 . . . and 1.24.1 . . . of Section 00700 General Conditions.");  Rosenfield Decl., Ex. 4 (Aug. 10, 2006 letter from the Joint Venture to AMEC reiterating that "[t]he delay associated with asphalt paving at Taxiway H is having a severely damaging impact on our overall schedule as delineated in the earlier letter," and noting that the Joint Venture "will be forced by circumstances to furlough all crews with exception of the saw and seal crew . . . . Please be advised also that we now expect to file a claim to recover time lost and monetary damages as provided in [the Subcontract]."); Rosenfield Decl., Ex. 6 (Aug. 26, 2006 letter from the Joint Venture to AMEC noting that "[t]he late change in specification and resultant delay to the entire project is proving very damaging to the Nippo/IBC Joint Venture. This is as previously reported to you and these damages are continuing."); Rosenfield Decl., Exs. 7, 8 (Two Sept. 2006 letters from the Joint Venture to AMEC noting that the suspension of HMA paving on taxiway H prevented closure and demolition of another taxiway, which in turn prevented other concrete paving activities.  Both letters indicated that the Joint Venture was continuing to incur delay damages. One letter noted, in particular, that "[t]he full impact will be determined by critical path analysis which will be carried out in due course. Delay damages that are continuing to accrue are substantial and we expect to recover the cost and time through a Change Order to be issued in accordance with appropriate claims provisions of the Contract.").

[55] Rosenfield Decl., Exs. 9 (E-mail from AMEC's McQuiston noting that the "[t]he asphalt mix design is a very critical issue at Andersen and the project can't move forward . . . without it"), 10 (E-mail from AMEC's McQuiston noting that he expected "AMEC will incur a delay claim as a result of this which will be quite significant. I expect $20,000 per day. This asphalt mix design is ruining the project and putting AMEC in a very bad position.").

[56] JV SOMF ¶¶ 24–25; Suga Decl., Ex. 44 (July 17, 2006 letter from the Joint Venture to AMEC noting that "[u]pon an initial review of the consolidation issue [the concrete experts] all indicate that sound engineered repairs can be made to this concrete without its removal and replacement."); Suga Decl., Ex. 48 (Aug. 31, 2006, letter from the Joint Venture to AMEC that stated: "Following thorough review of lane 5 concrete as it exists and made visible by removal of typical panels, it is concluded by expert opinion that honeycomb within the concrete is minor . . . . Since the honeycomb has been discovered in the concrete we agree that the voids should be filled with cementitious grout and that is what we intend to do."); Rosenfield Decl., Ex. 21 (Oct. 2, 2006, letter from the Joint Venture to AMEC that stated: "The referenced directive by AMEC [to remove lane 5 pavement] is seriously flawed.  It dictates that we engage in economic wastefulness contrary to our better judgment. . . . Notice is hereby given that we intend to submit a Claim in accordance with appropriate provisions of the Contract and applicable law to recover the very considerable cost and delay damages that will result from [AMEC's] directive.  We anticipate costs will exceed $3.5 million and time to carry out the activity will be 2-1/2 months. Project completion will be delayed by approximately one month."); Rosenfield Decl., Ex. 22 (Aug. 8, 2006 letter from the Joint Venture to AMEC noting that although the Contract requires removal of rain damaged pavement, the Joint Venture contested, based on test results, the

The Joint Venture asserts that these communications substantially comply with the notice provisions of the contract.  Additionally, the Joint Venture provides testimony that AMEC's project managers, inspectors and engineers were onsite and managed the project each day.[57]

AMEC argues that the "long and motley list of correspondence" proffered by the Joint Venture does not defeat summary judgment because it does not comply with the Subcontract's clear and unambiguous requirement that notice be provided within seven days of the conditions giving rise to the claim and include the amount of the claim with supporting data.[58]

The Court concludes that, based on the record, the Joint Venture did not, for some categories of claims, strictly comply with the contract requirements: despite the substantial correspondence between the Parties during the life of the contract, it is clear that even if the Joint Venture's notices were timely as to each category of claim, they did not provide the amount of the adjustment sought for each claim.  But because Nevada law governs here, that conclusion does not end the matter.  The Joint Venture has presented evidence demonstrating numerous timely communications with AMEC regarding the difficulties it encountered during the life of the Subcontract, notice that it was incurring damages and, in many cases, notice that it intended

---

determination that rain damage had occurred); Rosenfield Decl., Ex. 23 (Dec. 12, 2006, letter from the Joint Venture to AMEC stating that "extensive research and laboratory studies" and expert opinion indicates that "the alleged rain damage does not exist to any great extent," and that, though the Joint Venture was willing to remove and replace the affected panels, it did "not agree that we are required to remove them as part of our original contract work."  The letter further noted that,  "[a]ll spall repair has been carried out in accordance with [AMEC's] specification requirements and as detailed in procedures agreed by AMEC. The specified approach does not appear to be yielding desired results and we will be pleased to work with you and the Air Force in developing an appropriate solution."); Rosenfield Decl., Ex. 25 (January 15, 2007, letter from the Joint Venture to AMEC: "The [spall repair] work was performed in accordance with specification requirements and AMEC's direction and it failed to provide the desired quality result. . . . As it apparently turns out, this low slump mix cannot be consistently consolidated in the small cavities being filled for spall repairs.").

[57] Robertson Decl. ¶ 10.

[58] AMEC Reply at 3–5.

to seek an equitable adjustment to the Subcontract.  The Court thus concludes that, under Nevada law, the Joint Venture has presented sufficient evidence from which a reasonable jury could conclude that it provided sufficient notice to AMEC regarding the problems it was encountering and the damages it was sustaining.[59]  The Joint Venture contends that it could not have provided the damages estimates in change order requests issued contemporaneously with the delays because providing accurate estimates required the use of multiple experts and because the Joint Venture continued to incur delay damages up to the completion date of the project.[60]  Because AMEC disputes this contention,[61] this issue cannot be resolved at summary judgment. Accordingly, AMEC's motion for summary judgment on grounds that the Joint Venture failed to strictly comply with the notice provisions will be denied.

There is, however, one exception.  The Court will grant summary judgment as to Count 5, which involves additional costs incurred and delays suffered by the Joint Venture in completing the Project's electrical work.  The Joint Venture has not pointed to any evidence suggesting that it gave AMEC any notice whatsoever of the problems associated with the electrical work and its intent to seek equitable adjustment prior to the final completion date of the project.[62]

---

[59] See, e.g., S. Tex. Elec. Coop. v. Dresser-Rand Co., 575 F.3d 504, 507 (5th Cir. 2009) (where law did not require strict compliance with contractual notice provision, district court did not err in submitting to jury the question of whether contractor substantially complied with notice provisions).

[60] Robertson Decl. ¶¶ 13–18.

[61] AMEC SOMF ¶ 25 & Suga Decl., Exs. 3 (Robert LaFraugh Dep.) 6:18–20, 4 (Carl LaFraugh Dep.) 15:8–12.

[62] Both Parties have submitted a substantial number of exhibits associated with their motions, but the Joint Venture has not referred in its motion to any specific evidence supporting its argument that it provided AMEC with notice of the difficulties with the electrical specifications.  It is not this Court's job to sift through the record to find admissible evidence in support of the non-movant.  United States v. 5443 Suffield Terrace, Skokie, Ill., 607 F.3d 504, 510 (7th Cir. 2010), cert. denied, 131 S.Ct. 493.

Accordingly, the Court finds as a matter of law that such notice on the last day of the project

could not have provided AMEC with time to remedy the alleged problems before additional costs

and delay damages were incurred.  Accordingly, AMEC's motion for summary judgment as to

Count 5 will be granted.  Dismissal of Count 5 on these grounds, however, does not affect the

Joint Venture's claims related to unresolved change orders (Count 6) relating to electrical work,

on which AMEC has not sought summary judgment.

> **2.      Summary Judgment Regarding Count 2 & Portions of Count 7 (Failure
> to Submit a Contractually Compliant Hot-Mix Asphalt Design)**

AMEC moves to dismiss Count 2, relating to costs and delays resulting from AMEC's

allegedly defective HMA specifications, because it asserts that the Joint Venture was

contractually required to meet the HMA specifications provided to bidders, including the

specification for a minimum of 13% Voids-in-Mineral-Aggregate, and could have met those

specifications, but failed to do so.  Consequently, AMEC argues, as a matter of law, it cannot be

held responsible for damages resulting from the Joint Venture's own breach of contract.[63]  The

Joint Venture does not contest that it knew of and was bound by the HMA specifications;

instead, it responds that, although the contract is silent as to the source of the aggregate used in

the HMA, AMEC and the Joint Venture intended that the HMA mix would be made using only

locally available aggregate.  The Joint Venture contends it later learned that it was impossible to

meet the VMA requirements using only on-island aggregate.  The Joint Venture offers

circumstantial evidence, including the contract price for HMA work and AMEC's pre-dispute

conduct in support of its claim that both Parties intended the HMA contract requirements would

---

[63] AMEC Mot. at 4.

be met with locally available materials.[64]   AMEC argues that this is impermissible parol

evidence.  The Court agrees.

Under Nevada law, the parol evidence rule prohibits consideration of evidence that would

"add to, subtract from, vary, or contradict" a written contract that is "valid, complete,

unambiguous, and unaffected by accident or mistake."[65]  Parol evidence may be considered to

prove a separate oral agreement regarding issues on which the contract is silent and which is not

inconsistent with the contract terms,[66] to determine the intent and agreement of the parties where

a term or provision of the contract is ambiguous,[67] or to prove a subsequent oral agreement to

modify or rescind the contract.  While evidence of a party's intent may be used to clarify

ambiguous contract provisions and terms, it may not be used to create ambiguity where none

exists.[68]   That is, before the Court may consider extrinsic evidence regarding a party's intent,

there must be such an ambiguous term or provision.  But mere silence on an issue, for which no

contractual provision is made at all, does not in itself create an ambiguity warranting

consideration of parol evidence.[69]

---

[64] Decl. of James E. Street ("Street Decl.") ¶¶ 9–10, 15–16, 19; Robertson Decl. ¶ 58; Root Decl. ¶¶ 19–20; Rosenfield Decl., Ex. 48 at 22.

[65] M.C. Multi-Family Dev., L.L.C. v. Crestdale Assocs., Ltd., 193 P.3d 536, 545 (Nev. 2008) (quoting State ex rel. List v. Courtesy Motors, 590 P.2d 163, 165 (Nev. 1979)); see also Crow-Spieker # 23 v. Robinson, 629 P.2d 1198, 1199 (Nev. 1981).

[66] Crow-Spieker # 23, 629 P.2d at 1199; Ma-Gar Mining & Exploration Corp. v. Comstock Bank, 675 P.2d 992, 993 (Nev. 1984) ("The parol evidence rule should be no obstacle to the resolution of uncertainties or ambiguities created by an apparent conflict between the written terms of an agreement and the practical construction placed on the written terms by an *express* oral understanding of the parties.") (emphasis added).

[67] State ex rel. List, 590 P.2d at 165 (citing Nev. Refining Co. v. Newton, 497 P.2d 887 (Nev. 1972)).

[68] Kaldi v. Farmers Ins. Exch., 21 P.3d 16, 22 (Nev. 2001).

[69] See Kaldi, 21 P.3d at 22.

Because the Joint Venture has neither argued nor presented evidence that a separate oral agreement existed nor pointed to any ambiguity in the written contract, this Court will not consider the evidence presented by the Joint Venture nor determine whether the Parties intended only locally available aggregate would be used in the HMA mix.  First, the Joint Venture has argued, at most, that both Parties separately believed that locally available aggregate could be used in fulfilling the Subcontract's HMA specifications.[70]  That both Parties may have held this belief independently does not amount to a separate agreement that *only* locally available materials would be used to satisfy the terms of the Subcontract, as the Joint Venture contends.[71]  Accordingly, the parol evidence rule is inapplicable because no separate agreement is alleged to exist.[72]  Second, contrary to the Joint Venture's contention, the mere fact that the Subcontract is silent as to the source of the aggregate for the HMA does not create an ambiguity that permits this Court to use parol evidence to determine the Parties' intent as to source.  Extrinsic evidence may be permissible to address contract ambiguities where an *existing* contract provision gives rise to multiple interpretations, or where the alleged separate agreement on a matter on which the contract is silent does not contradict an existing contract term.[73]  Here, as the Joint Venture itself

---

[70]  See JV Resp. in Opp'n at 12 (AMEC must have assumed locally available aggregate would be used given that its estimate could be achieved only with local aggregate and AMEC's maximum contract price for HMA could not have been met using imported aggregate), 13 (AMEC never demanded that the Joint Venture import aggregate to meet the VMA specifications or suggested that it should do so).

[71]  The Joint Venture has not pleaded nor sought reformation on the basis of mutual mistake and thus the Court does not consider whether the parol evidence rule exception for mutual mistake would apply. See Russ v. Gen. Motors Corp., 906 P.2d 718, 723 (Nev. 1995).

[72]  Kaldi, 21 P.3d at 22–23.

[73]  See, e.g., Anvui, LLC v. G.L. Dragon, LLC, 163 P.3d 405, 407 (Nev. 2007) (parol evidence permissible to determine whether lease's provision regarding the remedy of sale of property precluded other remedies for lessor); M.C. Multi-Family Devel., LLC, 193 P.3d at 544–45 (evidence permissible where contract permitted members of a corporation to invest in other competing businesses but was silent on whether members could use corporation's

admits,[74] the detailed technical specifications incorporated into the Subcontract say nothing

regarding the source of the materials to be used.[75]  It has thus pointed to no provision or term

giving rise to an ambiguity which the Court is permitted to resolve using extrinsic evidence.  And

the Court has found no support for the proposition that silence as to the *source* of materials in a

construction contract creates an ambiguity regarding a technical specification that may be

addressed with parol evidence.  To find otherwise would subject every specification in

construction contracts to post-hoc additions of supply terms neither contemplated nor bargained

for.  Moreover,  by effectively seeking a new contract term that requires compliance with the

VMA specification *only if* it could do so using locally available aggregate,[76] the Joint Venture

asks the Court to construe the contract to add a term that *contradicts* an existing contract

provision (that the Joint Venture must meet the VMA specification).   But extrinsic evidence may

not be used to contradict an unambiguous requirement of the written contract,[77] and the case law

---

license to do so); Christensen v. Chromalloy Am. Corp., 656 P.2d 844, 848 (Nev. 1983) (evidence permissible because contract provision for mineral rights reservation did not "clearly establish that the parties intended to allow open-pit or strip mining of 'other minerals' referred to in the reservation"); Trans W. Leasing Corp. v. Corrao Constr. Co., 652 P.2d 1181, 1183 (Nev. 1982) (evidence of parties' communications and perceptions concerning two different sets of roof specifications permissible where contract referred to "specifications" without indicating *which* set of specifications were intended).

[74] JV Sur-Reply at 5 ("The Subcontract simply does not contain any provision addressing [the intended source of the aggregate].").

[75] Suga Decl., Ex. 22.

[76] The Joint Venture argues that AMEC is seeking to graft to the contract a requirement that the VMA specification must be met with imported aggregate.  JV Sur-Reply at 5.  The Court disagrees.  AMEC contends only that the contract required compliance with the specification, regardless of the aggregate's source.

[77] Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP, 440 F. Supp. 2d 1184, 1191 (D. Nev. 2006), aff'd, 583 F.3d 1232 (9th Cir. 2009) ("A court must limit such evidence to matters on which the existing written agreement is silent, *and the alleged oral agreement's terms must be consistent with the written agreement's terms*.") (emphasis added); M.C. Multi-Family Devel., L.L.C., 193 P.3d at 545 (holding that Nevada permits the admission of extrinsic evidence regarding the existence of a separate oral agreement where the written contract is silent and the alleged oral agreement is not inconsistent with the written contract's terms).

the Joint Venture cites is not to the contrary.[78]

Looking to the unambiguous terms of the contract, the Court holds that the Joint Venture was required to meet the HMA specifications and was free to use locally available aggregate if doing so met the specifications.  If the local materials did not meet the specifications and imported materials would have (as AMEC contends and the Joint Venture does not dispute[79]), then the Joint Venture's claims for damages under Count 2 on grounds of impossibility must fail.[80]

The Joint Venture argues, in the alternative, that regardless of the Parties' intent regarding the source of aggregate, AMEC's insistence on strict compliance with the specifications, which, it asserts, could not be met using local aggregate, constituted economic waste because those specifications were unnecessary given Guam's climate.[81]  The Court agrees.  The Joint Venture has presented evidence, including expert testimony, that the specifications were not necessary in a tropical climate, that AMEC opted for the VMA requirement though the Air Force would have accepted asphalt specifications that did not include that requirement, that importing aggregate

---

[78] The Joint Venture relies on Hilton Hotels Corp. v. Butch Lewis Prods., Inc., 808 P.2d 919 (Nev. 1991), for the proposition that Nevada permits consideration of extrinsic evidence regarding contractual intent without the barrier of the parol evidence rule.  See Pl.'s Supplemental Br. in Opp'n to AMEC's Mot for Partial Summ. J. ("JV Suppl. Mem.") at 4.  In Hilton, the alleged contract term sought to be proven did not contradict the terms of the written agreement, which was not a "model of clarity;" instead it clarified whether the contract to host a series of boxing matches required the participation of a particular fighter in just the first event, or all four events.  808 P.2d at 921. Moreover, as subsequent case law demonstrates, see, e.g., Kaldi, 21 P.3d at 21, the parol evidence rule is alive and well in Nevada.

[79] AMEC points to deposition testimony in which the Joint Venture's expert admits the specifications could have been met using imported aggregate.  AMEC Reply at 9 (citing Suga Decl., Ex. 5 (Root Decl.) 94:20-25). The Joint Venture does not contest this finding.

[80] Contract interpretation is a question of law. Farmers Ins. Exch. v. Neal, 64 P.3d 472, 473 (Nev. 2003).

[81] JV Resp. in Opp'n at 16–17.

would have been time-consuming and expensive, AMEC acknowledged that previous HMA work on Guam did not incorporate the VMA requirement, AMEC initially approved a variance from the specification but withdrew it upon objections from the Air Force, and AMEC had previously accepted an asphalt mix that used only locally available aggregate.[82]  These issues, largely uncontested by AMEC, present genuine disputes of material fact as to whether AMEC's initial insistence on strict compliance with the HMA standard constituted economic waste.[83]

But AMEC argues that the doctrine of economic waste is simply inapplicable where, as here, a contractor has been required to *repair*, rather than to *remove and replace*, defective work, and AMEC did not require the removal and replacement of any HMA pavement.  The Court disagrees.

The doctrine of economic waste is ordinarily a limitation on the general rule that contract damages shall be imposed to protect a party's expectation interest.[84]  The doctrine may be invoked by contractors seeking compensation for allegedly economically wasteful repairs incurred due to an owner's insistence on strict compliance.[85]  Under that doctrine, "the measure

---

[82] Root Decl. ¶¶ 7–18; Robertson Decl. ¶ 5; Rosenfield Decl. Exs. 9, 47, 58; Suppl. Decl. of Richard E. Root [doc. no. 112-2] Ex. A (Revised Suppl. Expert Report on HMA Pavement).

[83] AMEC's Statement of Material Facts asserts that the VMA specification was important to the safety of the runway because it would ensure durability of the pavement, preventing the asphalt from breaking apart and posing a risk that debris would be sucked into the engines of the aircraft, and was particularly essential for runways used by military aircraft because they travel more closely to the runway than commercial crafts.  AMEC SOMF ¶¶ 55–60.  This assertion demonstrates that genuine disputes of material fact remain as to the necessity of strict compliance with the standard.

[84] See generally F. James Robinson, If Wishes Were Horses: the Economic-Waste Doctrine in Construction Litigation, 70 J. Kan. Bar Ass'n. 28 (Apr. 2001).

[85] See generally, 6 Bruner & O'Connor Construction Law § 19:59 (2002); see also, e.g., Circle Constr. Grp., ASBCA No. 38844, 90-3 BCA ¶ 22999 (claim by contractor for denial of claim for costs associated with correcting defective asphalt).

of the owner's damages for the contractor's breach of the contract is the cost to repair or complete the work in accordance with the contract, unless the repair or completion would result in economic waste . . . ."[86]  The doctrine "limits an owner's recovery of 'cost to repair' damages to their added value," and "limits an owner's right to insist upon repairs in strict compliance with contract plans and specifications . . . ."[87]  Nevada appears to have adopted the economic waste doctrine.[88]  The test for waste under federal common law is whether the "cost of correction is economically wasteful and the work is otherwise adequate for its intended purpose."[89]  Similarly, in most states, the question is whether the cost of the repairs is disproportionate to the value obtained by the repair.[90]  The contractor bears the burden of proving that the loss in value from the defect is less than the cost of repair.[91]

The case law makes clear that the correction giving rise to the claim may be either repair *or* removal and replacement.[92]  And the Court has found no authority, from Nevada courts or

---

[86] 24 Williston on Contracts § 66:17 (4th ed.).

[87] See 6 Bruner & O'Connor Construction Law § 19:59.

[88] See, e.g., Hermann v. Varco-Pruden Bldgs., 796 P.2d 590, 592 (Nev. 1990) (concluding that damages based on diminution in value were inappropriate because the repair required would not result in economic waste); Mort Wallin of Lake Tahoe, Inc. v. Commercial Cabinet Co., 784 P.2d 954, 955 (Nev. 1989) (agreeing with district court's economic waste conclusion because there was "no error in its determination that the appropriate measure of damages is the diminution in the value of the property caused by the breach").

[89] Granite Constr. Co. v. United States, 962 F.2d 998, 1007 (Fed. Cir. 1992).

[90] See Robinson, *supra* note 83, at 31.

[91] 6 Bruner & O'Connor Construction Law § 19:59.

[92] See, e.g., Cashman Equip. Corp. v. U.S. Fire Ins. Co. 368 F. App'x. 288, 295 (3d Cir. 2010) (considering Massachusetts law, and noting a party suing for breach of a construction contract may be awarded damages based upon the cost to repair the defective work, unless such repairs would lead to unreasonable economic waste) (citing Restatement (Second) of Contracts § 348); Guest v. Phillips Petroleum Co., 981 F.2d 218, 221 (5th Cir. 1993) (noting Texas courts which apply the doctrine of economic waste "have held that it is improper to award damages . . . for the cost of *repair*, if the award of those damages results in economic waste") (emphasis added).

elsewhere, limiting application of the doctrine to cases in which *removal* of the defective work was required, nor have Defendants cited any.  And at least one federal court of appeals has rejected a claim that the doctrine is inapplicable except where extensive demolition and replacement has been required.[93]

The Court therefore finds that summary judgment as to the HMA claim (Count 2) and portions of the Delay Claim (Count 7) is not appropriate because of genuine disputes of material fact as to whether AMEC's insistence on compliance with the HMA specifications constituted economic waste.

> ### 3.      *Summary Judgment Regarding Count 3 & Portions of Count 7 (Failure to Establish the Elements of Economic Waste)*

AMEC moves for summary judgment as to Count 3, related to the removal of one mile of defective PCC pavement at Lane 5 of the runway, and that portion of Count 7 based on the delay costs from that removal and replacement.  Count 3 alleges that AMEC's insistence on removing nearly a mile of previously-laid PCC pavement and its rejection of the Joint Venture's proposed repair constituted economic waste for which the Joint Venture should be compensated.

In May 2006, the Joint Venture paved portions of Lane 5, a fill-in lane between Lane 4 and Lane 6, which had already been placed.[94]  The Subcontract required that the Joint Venture lay a thoroughly consolidated[95] slab throughout,[96] and required the Joint Venture to correct defective

---

[93] See Austin-Westshore Constr. Co. v. Federated Dep't Stores, Inc., 934 F.2d 1217, 1225 (11th Cir. 1991) (finding the argument that "economic waste principle should only be applied in situations involving more extensive destruction" to be without merit).

[94] Suga Decl., Ex. 8 (Butterfield Dep.) 97:19–24; Robertson Decl. ¶ 27.

[95] Consolidation is the process of removing entrapped air from freshly placed concrete and evenly distributing the mix components, often using vibratory equipment.  Am. Concrete Inst. Comm. 309, Guide for Consolidation of Concrete (No. ACI 309R-05) 309R-2, Am. Concrete Inst. (2005).  When concrete is not

work at its own cost.[97]  After sample cores drilled in late June 2006 demonstrated a lack of

consolidation in the Lane 5 pavement near the joint with Lane 4, AMEC issued a stop-work order

on the Lane 5 paving.[98]

To address the problem, the Joint Venture retained the forensic engineering firm WJE and

other outside consultants to investigate the defective paving and to develop a remedial plan.[99]  In

a July 17, 2006 letter, the Joint Venture informed AMEC that the initial review of its experts

concluded that repairs could be made that would result in pavement that substantially conformed

to the pavement specifications with equal structural integrity.[100]  The proposed remediation

involved saw cutting the affected pavement and inserting cementitious grout into the voids.[101]

The Joint Venture's expert concluded that removal was unwarranted because the degree of

consolidation in the cores, even without remediation, would permit full load transfer across the

lane 4/5 joint and would not result in long-term durability problems, but recommended that the

proposed remediation plan "be followed to ensure compliance with the specifications."[102]

On July 31, 2006, AMEC responded that the Air Force was willing to consider repair

---

sufficiently consolidated, excessive voids are created and aggregate and paste are unevenly distributed, weakening
the concrete.  See id.

[96] Suga Decl. Ex. 41 (PCCP specifications).

[97] Suga Decl., Ex. 16 (General Conditions Specifications).

[98] Suga Decl., Ex. 44 at unnumbered pp. 3, 11–12.

[99] Robertson Decl. ¶¶ 15, 28–29; Suga Decl., Ex. 3 (LaFraugh Dep.) 6:11–20.

[100] Suga Decl., Ex. 44.

[101] Suga Decl., Ex. 44 at unnumbered pp. 6–10.

[102] Suga Decl., Ex. 44 at unnumbered p. 12.

rather than removal and replacement, but admonished that the Joint Venture had a considerable burden of proving the effectiveness of the proposed remediation.[103]  AMEC required the Joint Venture to submit a final remediation proposal and the results of their test repairs by August 31, 2006.[104]  AMEC also claims that it required that the final proposal include data on load transfer capability (the ability of a joint to transfer load from one slab to the neighboring slab[105]), durability, and past performance of the repair method used in other runway projects.[106]  The Joint Venture contests that AMEC requested load transfer capability data prior to the Joint Venture's submission of the final proposal and that AMEC expressed concern about load transfer.[107]

In early August, the Joint Venture informed AMEC that testing of the proposed remediation would begin shortly, and conducted the testing between August 14 and August 22.[108] The Parties contest the extent to which AMEC was notified of the testing and whether AMEC was asked to participate in the testing procedures,[109] which the Joint Venture's expert contends

---

[103] Suga Decl., Ex. 46.

[104] McQuiston Aff. ¶¶ 51, 52; Rosenfield Decl., Ex. 35; Suga Decl., Ex. 47.

[105] Suga Suppl. Decl., Ex. B (LaFraugh Dep.) 18:18–19:5.

[106] AMEC Reply at 14-15; McQuiston Aff. ¶ 52.

[107] JV SOMF ¶¶ 51–52; JV Sur-Reply at 7.

[108] Robertson Decl. ¶¶ 30–33.

[109] Compare Rosenfield Decl., Ex. 33 at 4 (WJE report asserting the Joint Venture made repeated requests that AMEC be present at the job site and laboratory during the testing, but that no qualified engineer from "AMEC or the USAF was present to observe the saw cut sections, removed to reveal the joint, or to witness the density, compressive strength testing or physical proof of complete penetration into the voids") with Rosenfield Ex. 1 (Kenneth Grams Dep.) 70:9–72:24 (Grams saw some of the testing work conducted but no one from AMEC was told about the work or was invited to come on-site) and Suga Decl., Ex. 48 (Aug. 31, 2006 letter from the Joint Venture to AMEC noting that "extensive field testing [of the remediation] has been carried out and witnessed by representatives of both the AMEC and Air Force organizations").

was essential to determine the effectiveness of the repair.[110]  The Joint Venture conducted the proposed procedure on affected sections of slab and tested cores drilled from the test slabs.[111]

On August 25, 2006, one week before the final remediation proposal was due and after testing of the sample slabs was complete, AMEC informed the Joint Venture that it had consulted with its own experts, who believed that the Air Force would not accept any submission regarding the proposed repairs that did not include specific strength tests that AMEC had not previously requested of the Joint Venture.[112]

On August 31, 2006, the Joint Venture submitted a final remediation report to AMEC, which included test results and findings as to the repaired concrete samples, and recommended that repairs be conducted.[113]  The Joint Venture's expert report concluded that remediated sample cores taken near the joint demonstrated the same compressive strength as cores taken from areas unaffected by voids, demonstrating that the density and strength of the concrete could be restored by the proposed procedure.  The expert concluded that the particular tests that AMEC indicated would be required were unreliable.  But in compliance with contract requirements requiring measurement of compressive strength, the expert measured the compressive strength of the test cores and slabs and believed that, based on the correlation between compressive and flexural strength, the remediation effectively restored the flexural strength of the affected concrete.

---

[110] Rosenfield Decl., Ex. 33 at 4.

[111] Rosenfield Decl., Ex. 33 at 2.

[112] Suga Decl., Ex. 47.  In communications prior to the Joint Venture's testing, AMEC's experts had not mentioned the specific tests, but suggested instead the need to show of flexural strength based on a correlation with compressive strength.  Rosenfield Decl., Exs. 30, 31.

[113] Suga Decl., Ex. 48.

During the summer of 2006, the Joint Venture's expert also began conducting finite material testing—a type of modeling to evaluate structural integrity—to determine whether load transfer capability would be affected by the repair.[114]  When it was later completed in 2007 (after AMEC ordered removal of the pavement), that testing indicated sufficient ability to transfer loads across the joint.[115]

In early September, AMEC's expert consultant suggested additional testing and verification.[116]  An internal AMEC e-mail noted that the expert and two other AMEC engineers "believe [the concrete] could be repaired reasonably with certain precautions and verification to provide an acceptable product."[117]

Finally, on September 18, 2006, AMEC recommended that the Air Force reject the repair proposal and require removal and replacement of the Lane 5 pavement.[118]  On September 27, 2006, the Air Force notified AMEC that, based on its own consultant's review of the final remediation proposal and the Air Force's finding that the report did not provide sufficient evidence of life expectancy to match the specifications, it agreed that removal and replacement were required.[119]  The Air Force consultant's report concluded that, although WJE's conclusions as to strength and durability of the concrete may be correct, its report was inconclusive as to the

---

[114] Suga Suppl. Decl., Ex. B (LaFraugh Dep.) 18:5–11.

[115] Rosenfield Decl., Ex. 33 at 7.

[116] Rosenfield Decl., Ex. 36.

[117] Rosenfiled Decl., Ex. 38.  One AMEC engineer reportedly voiced discomfort with the repair and did not recommend it.

[118] Rosefiled Decl., Ex. 40.

[119] Suga Decl., Ex. 50.

long-term effectiveness of the proposed repairs; the report also expressed concern about the lack

of particular strength tests (that the Joint Venture thought unnecessary) and other supporting

strength data, the lack of data associated with the life expectancy of the repairs, and the differing

conditions of sites where similar procedures had been used successfully.[120]   On September 29,

2006, AMEC instructed the Joint Venture to begin removal and replacement and denied its

requests to meet with the Air Force to discuss remediation.[121]   The Joint Venture sought

reconsideration, noting removal and replacement would cost some $3.5 million and delay the

project by two months, and protesting the lack of "proper basis for rejection."[122]   In an October

2006 letter, AMEC provided the basis for its decision, asserting that the consequences of

inadequate pavement might result in damage to aircraft that could be life threatening.[123]   AMEC

identified deficiencies in the Joint Venture's testing and expressed concerns regarding load

transfer capability, the lack of particular strength tests and other concerns with strength and

durability.[124]

 The Joint Venture presents two expert reports by Robert LaFraugh of WJE that dispute

the validity of AMEC's concerns.[125]   LaFraugh opines that removal was unjustified because the

repair met or exceeded design requirements and that the Joint Venture's methods for assessing

strength were supported by science and consistent with the recommendations of AMEC's own

---

[120] Suga Decl., Ex. 50.

[121] Suga Decl., Ex. 51.

[122] Rosenfield Decl., Ex. 21.

[123] Suga Decl., Ex. 49.

[124] Suga Decl., Ex. 49.

[125] Rosenfield Decl., Exs. 33, 34.

experts.  LaFraugh also addresses concerns about the load transfer capability of the repaired

concrete, including the conclusion that load transfer capability was confirmed by the finite

materials testing.

AMEC moves for summary judgment as to Count 3 and portions of Count 7 because, it

argues, as a matter of law, the removal and replacement of the PCC pavement did not constitute

economic waste.  AMEC's motion appears predicated almost entirely on the alleged failure of the

Joint Venture to provide specific data about load transfer capability in its August 31, 2006 final

proposal.[126]  AMEC urges the Court to adopt a standard that would require a finding that there

can be no economic waste as long as the replacement decision was based on reasonable concerns

held at the time of the decision and the decision was not arbitrary.[127]

Under AMEC's proposed standard, a claim for economic waste will not lie if: (1) the

concerns underlying the replacement directive were based on its reasonable concerns at the time

its decision was rendered; (2) it considered the sufficiency of the proposed repair; and (3) its

decision to require replacement was made after review of the proposed repair or was not

otherwise arbitrary.[128]  AMEC contends that based on this standard, summary judgment is

warranted because there are no genuine issues of material fact that: it gave the Joint Venture

ample time (two months) to develop and present a remediation plan; the need for data

establishing load transfer was known to the Joint Venture; the Joint Venture failed to provide any

---

[126] AMEC Reply at 12–13, 17–19.

[127] AMEC Reply at 13, 14 (a contractor's burden to show that the proposed corrective work substantially complies with contract specifications "must [be] satisfied during the Project, prior to the decision being made regarding necessary repairs;" "[i]f a review of a proposed repair results in reasonable concerns . . . there is no claim for economic waste").

[128] AMEC Reply at 14.

data supporting its assertions of load transfer capability in its final report; and AMEC's concerns regarding load transfer capability were reasonable.[129]

The Joint Venture does not dispute that the Lane 5 PCC pavement was defective, but instead asserts that a finding of economic waste depends not on whether the *concerns* were reasonable, but instead on whether the *decision* to require replacement was reasonable in light of the repair's substantial compliance with Subcontract specifications and the repaired work's adequacy for its intended purpose.[130]  The economic waste doctrine directs that an owner should not be permitted to require replacement of non-compliant work where the cost of replacement is disproportionate to the gain that will be realized from the replacement, and the work is otherwise adequate for its intended purpose.[131]  In such cases, the owner is entitled to a reduction in the contract price, rather than strict compliance with the contract specifications.[132]  The Joint Venture contends that here, there remain genuine issues of material fact as to whether the Joint Venture's proposed remediation rendered the PCC paving substantially compliant with contract specifications, particularly with respect to load transfer capability, rendering the repaired pavement suitable for its intended purpose.[133]

The Court agrees with the Joint Venture and declines to adopt AMEC's proposed

---

[129] AMEC Mot. at 4–5; AMEC Reply at 14–19.

[130] JV Resp. in Opp'n at 8–10; JV Sur-Reply at 6.

[131] See Granite Constr. Co., 962 F.2d at 1007; M.A. DeAtley Constr., Inc. v. United States, 75 Fed. Cl. 575, 582 (2007) ("[I]n order for Plaintiff to recover under a theory of economic waste, the Court must determine whether the aggregate 'substantially complied with the specifications,' the work performed was otherwise adequate for its intended purpose, and the cost of correction was economically wasteful.") (citation and internal quotations omitted).

[132] Id.

[133] JV Resp. in Opp'n 9–10; JV Sur-Reply at 6–8 (citing Granite Constr., 962 F.2d at 1007).

standard for economic waste.  AMEC relies entirely on <u>Appeal of Eller Construction</u>,[134] which

involved a decision by a government board of contract appeals (serving as the fact finder), for the

proposition that contemporaneous reasonableness of the owner's concern is the correct standard.

But in <u>Eller</u>, the appeals board concluded that the "Government's rejection of the structure was

[not] arbitrary or unreasonable" only *after* evaluating the sufficiency of the proposed repairs and

concluding that  "the extent and cost of adequate repairs . . . were significant, compared with the

cost of removal, and that the . . . durability of the structure [was] compromised."  In fact, <u>Eller</u>

appears to have considered the results of some tests apparently conducted *after* replacement had

been ordered and performed.[135]  The case does not, therefore, support a finding that the

reasonableness of a *concern* is dispositive of economic waste regardless of a post-hoc finding of

the extent of the damage and the proposed repair's sufficiency.  <u>Eller</u>'s reasonableness test

simply does not articulate a different standard for economic waste.

Even if the Court were to adopt AMEC's standard, there are genuine disputes of material

fact as to whether AMEC actually held concerns about load transfer capability at the time it

recommended rejection of the plan, such that its rejection of the repair was not arbitrary.  The

Joint Venture has presented evidence that load transfer testing was not required under the

contract specifications and that AMEC's own engineers did not express concern about load

transfer ability prior to or in the weeks after submission of the Joint Venture's final report, and

asserts AMEC never specifically requested load transfer data.[136]  AMEC contends, however, that

---

[134] AGBCA No. 77-171-4, 83-2 BCA ¶16,560 (1983).

[135] <u>Id.</u> ¶ 19 (lab test results submitted to contractor one-year after removal and replacement).

[136] <u>See</u> JV Sur-Reply at 7; Rosenfield Decl., Exs. 30, 31, 36, 38.

it required that the final repair proposal demonstrate such data, and the Joint Venture was aware of the need for such data.[137]  These disputes cannot be resolved on motions for summary judgment.

The Court finds, however, that the correct standard for the Joint Venture's economic waste claim is whether the proposed repair would have been suitable for its intended use[138]—which the Joint Venture bears the burden of proving—and concludes there are genuine issues of material fact on that question.  There are issues of fact as to whether the repaired concrete with strength and density comparable to unaffected concrete restored load transfer capability and whether specific testing of load transfer capability was necessary to demonstrate restoration of the pavement.  The Joint Venture has presented expert evidence that load transfer capability was sufficient, the strength of the remediated pavement was sufficient even without the specific tests AMEC sought, and the remediated pavement was sufficiently safe and durable.  To be sure, the Joint Venture will bear a heavy burden of proving economic waste at trial, but it is entitled to the chance to meet it.  Accordingly, summary judgment as to Count 3 and related portions of Count 7 will be denied.

     *4.*      *Summary Judgment Regarding the Joint Venture's Damages Methodology (Counts 2, 4 & 5)*

The Joint Venture seeks to prove 28% of the damages for Count 2 (relating to HMA specifications) and all of the damages for Count 4 (relating to PCC Pavement completion) and

---

[137] AMEC SOMF ¶ 138; McQuiston Aff. ¶ 52.

[138] Granite Constr., 962 F.2d at 1008.

Count 5 (relating to electrical specifications)[139] using a modified total cost method.  A total cost

method calculates damages by subtracting the bid amount from the total actual costs of the

project.[140]  A modified total cost method subtracts from that difference any bidding errors or cost

overruns for which the contractor itself is responsible or which were caused by parties other than

the owner.[141]   Under the modified method, the total cost overruns are  "adjusted for any

deficiencies in the contractor's proof in satisfying the requirements of the total cost method."[142]

Neither approach is favored, however, and should be used only where actual costs cannot be

determined.  And under both approaches, the plaintiff bears the burden of demonstrating: "(1) the

impracticability of proving its actual losses directly; (2) the reasonableness of its bid; (3) the

reasonableness of its actual costs; and (4) lack of responsibility for the added costs."[143]  Under a

total cost methodology, a court may adjust damages to reflect a reasonable bid or to account for a

---

[139] Because the Court will dismiss Count 5 based on the Joint Venture's lack of evidence regarding timely notification, the Court will not address that portion of AMEC's motion regarding total cost methodology as it relates to Count 5.

[140] Sunshine Constr. & Eng'g, Inc. v. United States, 64 Fed. Cl. 346, 371 (2005) (citing Raytheon Co. v. White, 305 F.3d 1354, 1365 (Fed. Cir. 2002)); see also William Schwartzkopf and John J. McNamara, Calculating Construction Damages 14 (2001).

[141] Schwartzkopf & McNamara, *supra* n.140, at 21.

[142] Propellex Corp. v. Brownlee, 342 F.3d 1335, 1339 (Fed. Cir. 2003) (citing Servidone Constr. Corp. v. United States, 931 F.2d 860–62 (Fed. Cir.1991)).

[143] Sunshine Constr., 64 Fed. Cl. at 371 (citations and quotations omitted).

Although Nevada law governs this case, Nevada case law provides no guidance as to whether it would permit these methods of proof and what standard it would apply if it did.  The Parties have therefore relied on both federal law and other state law to supply the relevant standard.  See AMEC Reply at 19–20; JV Resp. at 18–19 & n.15.  Because many state courts considering these methods apply the same standard as that applied by federal courts,  see, e.g., Lee Masonry, Inc. v. City of Franklin, No. M2008-02844, 2010 WL 1713137, at *14 (Tenn. Ct. App. Apr. 28, 2010) (citing Servidone, 931 F.2d at 861); Tupelo Redev. Agency v. Gray Corp., 972 So.2d 495, 515 (Miss. 2007) (citing Propellex, 342 F.3d at 1339);  Amelco Elec. v. City of Thousand Oaks, 38 P.3d 1120, 1130 (Cal. 2002) (citing, *inter alia,*  Servidone, 931 F.2d at 861), this Court predicts the Nevada Supreme Court would do likewise.

plaintiff's own culpability.[144]

AMEC has moved for summary judgment as to damages for these Counts, arguing that the Joint Venture cannot meet the stringent requirements to prove damages under these methodologies.   AMEC argues that the Joint Venture cannot establish the reasonableness of its own bid for the HMA and PCC paving because the Joint Venture employee responsible for preparing estimates for the Subcontract bid, James Street, relied on local, on-island International Bridge Corporation ("IBC") staff to determine the appropriate labor productivity rate used to estimate labor costs for the HMA and PCC Pavement portions of the Project rather than analyzing IBC's historical productivity data for Guam, and received those data only orally from IBC.[145]   Similarly, it contends that the Joint Venture's damages expert, Carl LaFraugh, cannot opine on the reasonableness of the bid because LaFraugh relied on Street's purportedly deficient personal knowledge, and he conducted no independent analysis of the bid, reviewing only project records.[146]   Notably, AMEC does not argue that the bid was, in fact, unreasonable; instead it asserts that the Joint Venture has presented no evidence of reasonableness.

The Joint Venture counters that Street was an experienced estimator[147] who estimated the HMA and PCC paving costs only after traveling to Guam, observing local conditions and availability and costs of local materials, and researching local labor markets "in terms of rates,

---

[144]   Cavalier Clothes, Inc. v. United States, 51 Fed. Cl. 399, 418 (2001).

[145]   AMEC Reply at 21–22.

[146]   AMEC Reply at 23.

[147]   Delco Elec. Corp. v. United States, 17 Cl. Ct. 302, 328 (1989), aff'd, 909 F.2d 1495 (Fed. Cir. 1990) (considering as evidence of a realistic bid that the "the original contract was performed by highly qualified personnel and was based on extensive experience [in projects] similar to that called for by the original contract.").

productivity and expertise."[148]  In addition, LaFraugh concluded that the estimate for the HMA

work was in line with AMEC's own estimate and competitive with other bidders,[149] and that

AMEC itself sought reductions in the price for the electrical work based on its own estimate of

costs.[150]  LaFraugh's expert opinion was also based on his review of project records.[151]  The Joint

Venture has presented evidence sufficient to create a genuine dispute of fact regarding the

reasonableness of the bid.  And if, at trial, the Joint Venture cannot establish reasonableness,

damages can be adjusted to reflect a reasonable bid.[152]  Accordingly, AMEC's motion on

damages will be denied.

### B.    The Joint Venture's Motion for Partial Summary Judgment Regarding Liquidated Damages

The Joint Venture asks the Court to find that AMEC improperly withheld $837,500 in

liquidated damages for delays associated with the North Runway project, arguing that the

liquidated damages clause of the Subcontract is unenforceable.[153]  Under Nevada law,  whether a

liquidated damages clause is enforceable is a matter of law for the Court to decide.[154]  Such

clauses are *prima facie* valid unless the challenging party demonstrates that the clause amounts to

---

[148] JV Sur-Reply at 8; Street Decl. ¶ 5.

[149] The owner's estimate is among evidence that may support or refute a bid's reasonableness. Youngdale & Sons Constr. Co. v. United States, 27 Fed. Cl. 516, 543 (1993) (considering the government's estimate and other bids to determine a reasonable bid).

[150] LaFraugh Decl. ¶ 22 & Ex. B at 210–11, 226–27.

[151] LaFraugh Decl. ¶ 19.

[152] Youngdale, 27 Fed. Cl. at 543 (modifying plaintiff's bid so as to satisfy element 2 of the total cost method test).

[153] Doc. no. 70.

[154] Loomis v. Lange Fin. Corp., 865 P.2d 1161, 1163–64 (Nev. 1993).

an unenforceable penalty.[155]  The challenging party can do so by presenting evidence that the

liquidated damages amount is disproportionate to the actual damages sustained by the enforcing

party.[156]

AMEC's prime contract with the Air Force included Task Order 0013, a cost-plus-fixed-

fee contract for repair of the North Runway at Andersen.[157]  Though Task Order 0013 did not

include a liquidated damages clause related to Runway Project delays,[158] the prime contract did

not guarantee payment for costs resulting from extended or late performance, incorporating

instead a provision of the Federal Acquisition Regulation ("FAR") which provided that payment

would be made in amounts determined to be allowable by the contracting officer based on a

range of factors, including reasonableness.[159]  The Air Force extended the initial September 30,

2006 completion deadline applicable to the prime contract for the North Runway Project to

August 31, 2007.[160]

After entering into the prime contract, AMEC entered into the fixed-price Subcontract

with the Joint Venture.[161]  The Subcontract included a clause providing that the Joint Venture

---

[155] Id. at 1164 (citing Joseph F. Sanson Inv. v. 286 Ltd., 795 P.2d 493, 497 (Nev. 1990)).

[156] Id.

[157] JV's Br. in Supp. of Pl.'s Mot. for Partial Summ. J. re: Liquidated Damages ("JV Mem. re: Liquidated Damages"), Decl. of Sharon Money ("Money Decl.") [doc. no. 70-3] ¶ 4; Def./Counterclaimant's Opp'n to Pl.'s Mot. for Partial Summ. J. re: Liquidated Damages ("AMEC Mem. in Opp'n re: Liquidated Damages"), Aff. of Philip H. McQuiston re Liquidated Damages ("McQuiston Aff. re: Liquidated Damages") [doc. no. 73-4] ¶ 5.

[158] Money Decl. ¶ 4.

[159] AMEC Mem. in Opp'n re: Liquidated Damages at 4 & Ex. A (Prime Contract) at 26.

[160] JV Mem. re: Liquidated Damages, Decl. of Kevin A. Rosenfield in Supp. of Pl.'s Mot. for Partial Summ. J. re: Liquidated Damages ("Rosenfield Decl. re: Liquidated Damages") [doc. no. 70-2], Ex. B at 1–2.

[161] The amount of the fixed price contract exceeded $21 million.  See AMEC SOMF ¶ 16; JV SOMF ¶ 3; McQuiston Aff. re: Liquidated Damages ¶ 9; Rosenfield Decl. re: Liquidated Damages ¶ 2, Ex. A.

shall pay AMEC—as liquidated damages and not as a penalty—$2,500 per day for each day that

the Joint Venture's work on the Project exceeded the deadline under the Subcontract.[162]  The

Joint Venture and AMEC extended the initial April 26, 2006 Subcontract completion deadline to

June 29, 2006.[163]  AMEC ultimately accepted the Joint Venture's work on May 31, 2007,[164] and

withheld payment totaling $837,500 in liquidated damages for the 335 days the project

completion was overdue.[165]

      The Joint Venture argues that, because the prime contract between the Air Force and

AMEC provided for full reimbursement of AMEC's actual costs and did not itself contain a

liquidated damages clause, AMEC did not incur any damages from the Joint Venture's delay,

thus rendering the liquidated damages clause unenforceable as disproportionate to actual

damages.  The Joint Venture appears to contend that the clause is enforceable only if the prime

contract also imposed on AMEC delay-based liquidated damages, or if AMEC had sought, and

been denied, reimbursement from the Air Force for the delay costs it incurred under the

Subcontract.[166]

      AMEC presents evidence that the liquidated damages amount of $2,500 per day was

based on a good faith estimate of the costs AMEC would incur to perform oversight and

management of the project for each day beyond the completion deadline in the Subcontract; that

---

[162]   AMEC Mem. in Opp'n re: Liquidated Damages at 5; Rosenfield Decl. re: Liquidated Damages ¶ 2, Ex. A (Subcontract General Conditions), ¶ 1.33.

[163]   McQuiston Aff. re: Liquidated Damages ¶¶ 16–17; Rosenfield Decl. re: Liquidated Damages ¶ 6, Ex. D.

[164]   McQuiston Aff. re: Liquidated Damages ¶ 19; Rosenfield Decl. re: Liquidated Damages ¶ 4, Ex. C.

[165]   McQuiston Aff. re: Liquidated Damages ¶¶ 21, 24; Rosenfield Decl. re: Liquidated Damages ¶ 5.

[166]   JV Mem. re: Liquidated Damages at 6–8.

it did, in fact, incur delay costs in excess of that liquidated amount; and that it passed on to the

Air Force only those delay costs in excess of the liquidated damages amount.[167]  The Court also

notes that the Joint Venture presents no authority to support its contentions that subcontract

liquidated damages clauses are enforceable only where there is a comparable clause in the prime

contract, or where a prime contractor unsuccessfully attempts to mitigate its damages[168] by

seeking payment from the owner for delay costs caused by the subcontractor.  Moreover, the

Joint Venture presents no evidence that the Subcontract's liquidated damages clause was

contingent on the imposition of liquidated damages on AMEC by the Air Force or on the Air

Force's denial of pass-through delay costs sought by AMEC.

Because the Joint Venture has not established as a matter of law that the liquidated

damages clause is an unenforceable penalty, the Joint Venture's motion will be denied.

### C.    The Joint Venture's Motion for Partial Summary Judgment on Undisputed Change Orders

Finally, the Joint Venture moves for summary judgment that it is entitled to payment for

nine undisputed, previously approved, but as yet unexecuted change orders.[169]  The Joint Venture

submitted the change order requests ("CORs") for payment of costs associated with changes or

additions to the work under the Subcontract as directed by AMEC.[170]  Though AMEC approved,

---

[167] McQuiston Aff. re: Liquidated Damages ¶¶ 14, 23–24.

[168] In many jurisdictions, an enforceable liquidated damages clause in an ordinary contract case obviates the duty to mitigate.  See, e.g., Malinowski v. Wall Street Source, Inc., No. 09-9592, 2010 WL 3910155, at *1 (S.D.N.Y. Sept. 29, 2010); Hitachi Med. Sys. Am., Inc. v. Trinity Health Care LLC, No. 06-3072,  2008 WL 1809080, at *4 (N.D. Ohio Apr. 21, 2008) (applying Ohio law).  The Court has found no authority that suggests Nevada law requires a different approach.

[169] Pl.'s Mot. for Partial Summ. J. re: Undisputed Change Orders [doc. no. 79].

[170] Br. in Supp. of Pl.'s Mot. for Partial Summ. J. re: Undisputed Change Orders [doc. no. 79-1] ("JV Mem. re: Undisputed Change Orders") at 1.

in writing, each of the nine CORs at issue,[171] AMEC has not paid the Joint Venture for any of the

relevant CORs.[172]  The nine CORs at issue are:[173]

- COR 11: $1,418.38 for AMEC's portion of the costs of installing electrical supply to the Project's material testing labs;

- COR 19: $206,499.00 for the cost of importing 12,147 tons of base course material not provided for in the original contract;

- COR 27: $11,127.69 for costs associated with AMEC's change in runway light canister design;[174]

- COR 28: $6,733.18 for costs to install additional wire conductors for Precision Approach Path Indicators and Runway End Identification Light fixtures;

- COR 29: $9,064.81 for costs to relocate lines in an existing duct bank to a lower conduit along the runway;

- COR 32: $4,000.00 for costs to replace taxiway edge striping;

- COR 33: $3,023.33 for costs to modify the grading of an asphalt shoulder and to add an access road;

- COR 41: $1,123.71 for costs to fill a sinkhole; and

- COR 46: $3,076.36 for costs associated with repairing the joint sealant on the runway after it was damaged by another subcontractor.

AMEC does not dispute that the Joint Venture performed the work and incurred the costs

reflected in each of the CORs, nor that, in July 2007, AMEC  had agreed in writing to the

---

[171]  Decl. of Kevin Rosenfield in Supp. of Pl.'s Mot. for Partial Summ. J. re: Undisputed Change Orders [doc. no. 79-2] ("Rosenfield Decl. re: Change Orders"), Ex. A (July 13, 2007 AMEC letter) at 3–6.

[172]  Decl. of John Robertson [doc. no. 79-3] ("Robertson Decl. re: Change Orders") ¶ 3.

[173]  Robertson Decl. re: Change Orders ¶¶ 4–39 & Exs. A–I.

[174]  AMEC partially disputed COR 27, asserting it was not responsible for the costs of insurance associated with the extra work.  But the Joint Venture has conceded the disputed amount ($663) to AMEC.  See JV Mem. re: Undisputed Change Orders at 1, 7–8; Robertson Decl. re: Change Orders, Ex. A.

amounts specified in each COR.  Instead, AMEC insists that it believed at the time of those

agreements that each COR included all direct and indirect costs associated with each change,

including costs related to changes in the sequence of work, delays, disruptions, rescheduling,

extended overhead, acceleration, and impact costs.[175]  In September 2007, the Joint Venture

informed AMEC that the CORs did not reflect some indirect costs that were difficult to quantify

at the time the change orders were prepared and the work took place, and that it would seek to

recover indirect costs associated with at least some of the relevant changes in its request for

equitable adjustment[176] (which forms the basis for the Joint Venture's claims in counts 1–5 &

7–8 of the Complaint).  AMEC asserts that awarding summary judgment on the nine CORs

would result in a double recovery of *indirect* costs associated with each change order because, it

contends, the approved amounts already reflect those indirect costs.[177]  AMEC therefore insists

that a genuine dispute exists as to whether there was any agreement at all on the amount due the

Joint Venture for the CORs because there was no agreement about whether they would be

inclusive of all costs.

The Court cannot agree.  The evidence AMEC presents does not create a genuine dispute

of material fact as to whether or not the Joint Venture is entitled to the amounts in the nine

change orders; instead, the evidence creates a genuine dispute about whether the Joint Venture is

entitled to any *more* than those amounts (for indirect costs), recoverable through its other counts

---

[175]  Def./Counterclaimant's Opp'n to Pl.'s Mot. For Partial Summ. J. [doc. no. 86]  ("AMEC Opp'n re: Change Orders") at 2–4 & Affidavit of Thomas Carr ("Carr Aff. Re: Change Orders") ¶ 7.

[176]  Carr Aff. ¶ 8, Ex. A (Sept. 2007 letter from the Joint Venture to AMEC noting that "[t]he submitted costs records [for the change orders] do not include costs related to disruption to the work that could not be readily quantified.").

[177]  Carr Aff. ¶ 8 & Ex. A.

against AMEC.   AMEC claims that when it approved the CORs, it believed they encompassed all costs, and that a January 2007 letter from the Joint Venture identified the amounts for each COR as "complete and equitable adjustments in cost and time."[178]  In fact, the letter made that statement for only three of the nine change orders.[179]  And the Joint Venture presents evidence that, for each of the change orders, the Joint Venture expressly notified AMEC at the time the COR was submitted that the amounts requested excluded indirect costs and that the Joint Venture reserved the right to later seek recovery for those costs prior to final settlement.[180]  Thus, the material question in dispute here is what may the Joint Venture recover, if anything, *in excess* of the amounts in the CORs, for indirect costs associated with the relevant contract changes.

AMEC's argument that the Court may not decide this issue at summary judgment because there was no "meeting of the minds" as to whether the CORs must encompass all costs associated with a change is unavailing.  As the evidence makes clear (and as AMEC itself concedes[181]), there was an agreement to increase the contract price in an amount *at least* equal to the amounts reflected in the change orders.  The question of whether that amount encompasses

---

[178]  See AMEC Opp'n re: Change Orders at 3; JV Mem. re: Change Orders, Rosenfield Decl. re: Change Orders, Ex. E.

[179]  JV Mem. re: Change Orders, Rosenfield Decl. re: Change Orders, Ex. E (complete and equitable adjustment for CORs 29, 32, and 33).

[180]  Each COR included the following language:

The compensation and completion time allowed by this change order does not include any amounts for changes in the sequence of work, delays, disruptions, rescheduling, extended overhead, acceleration, and/or impact costs, and the right is expressly reserved to make a claim for any and all of these and related items of cost prior to any final settlement of this contract.

Robertson Decl. re: Change Orders, Exs. A–I.

[181]  AMEC Sur-Reply re: Change Orders [doc. no. 101] at 4–5 ("[T]he parties reached a negotiated compromise as to the amount to be paid for certain changes but were then unable to reach agreement as to what exactly that price was intended to cover.").

*all* costs is in dispute and may be resolved at trial.  Proper jury instructions will be sufficient to resolve AMEC's concerns regarding potential duplicative recovery if there is any judgment in favor of the Joint Venture on the other counts.  Therefore, the Court grants summary judgment on the Joint Venture's claim for the total due for the nine CORs.[182]  As this amount is subject to AMEC's counterclaims and any offsets, no judgment will be entered at this time.

## IV.    CONCLUSION

AMEC's motion for partial summary judgment is granted with respect to Count 5, and is otherwise denied.  The Joint Venture's motion for partial summary judgment regarding liquidated damages is denied, and its motion for summary judgment for payment of the nine undisputed changes orders is granted, subject to AMEC's counterclaims and any offsets.  An appropriate Order will be entered.

---

[182] The Joint Venture seeks judgment for $290,694.42 plus prejudgment interest for the nine change orders. The Joint Venture does not explain how it reached that total, and the Court's calculation of the sum of the nine change orders produces a different total.  Accordingly, the Court concludes that the Joint Venture is entitled to only the sum of the nine change orders, plus prejudgment interest, to be determined at trial.